## Case No. 11,634.

### Ex parte REED.

[4 Cranch, C. C. 582.] [1]

Circuit Court, District of Columbia. Nov. Term, 1835.

JUSTICE OF PEACE—JURISDICTION—PENAL ACTIONS—CONFINEMENT AT LABOR—CHARTER OF WASHINGTON CITY.

1. Fines, penalties, and forfeitures, under by-laws of the corporation of Washington, not exceeding $50, are recoverable before a justice of the peace.

[Cited in Hall v. Washington, Case No. 5,953.]

2. There does not appear to have been given to the corporation of Washington, by any of its charters, or the amendments thereof, any authority, directly, to punish any free persons corporally for the breach of its by-laws. It can only impose fines, penalties, and forfeitures for the violation of its ordinances, to be recovered as debts.

3. The only case in which labor may be added to imprisonment for the non-payment of a fine is that of a free negro or mulatto who has been convicted of being present at a disorderly meeting, and who is unable to pay the fine; for, if he is able to pay, it may be recovered by the ordinary process of execution.

4. If unable to pay in money, it was intended by the charter, that he should pay in labor; and he could not be forced to labor, unless confined; hence it was provided, that he should be confined to labor, instead of a simple imprisonment upon a ca. sa. It was not so much intended as a punishment as a means of recovering the penalty.

5. In all cases of the breach of the by-laws, the prosecution is by an action of debt, and the judgment can only be for the fine, penalty or forfeiture.

6. In ordinary cases the execution to enforce the payment is a ca. sa., fi. fa., or attachment.

7. In the case of the inability of a free negro or mulatto to pay a fine for the offence of disorderly meeting, it may be by commitment to labor for a limited time; the difference is not in the judgment, but in the execution.

8. In all cases the prosecution is for the recovery of the penalty.

9. A fine or penalty, incurred by the breach of a by-law, is a debt, and recoverable as such.

10. The corporation of Washington has authority, under its charter, to require security for good behavior of persons guilty of grossly indecent language or behavior publicly in the streets, and to cause them to be confined to labor, if they refuse, or are unable to give the security required; and the justices of the peace, individually, have authority to require the security, and to commit for want of it, but the indecent language or behavior must be publicly in the streets.

11. That part of the by-law which requires security to be given by persons guilty of simple "profane or indecent language or behavior" is not warranted by the charter, and is void; but so far as it requires security to be given by "disorderly persons" it is valid.

12. The warrant of commitment should state that the party was required to give the security, the amount of the security required, and for what period of time, so that it may appear that the amount and time were reasonable.

13. The commitment may be to labor, but not to hard labor.

[1] [Reported by Hon. William Cranch, Chief Judge.]

This was a writ of habeas corpus, commanding Richard Butt, superintendent of the Washington Asylum, to bring up the body of Julia Reed with the cause of her commitment and detainer; and, upon the return, it appeared that she was committed and detained by virtue of the following warrant: "District of Columbia, County of Washington, to wit: To L. S. Beck, Constable of the Second Ward of the City of Washington, and Richard Butt, Intendant of the Washington Asylum. Whereas Julia Reed stands convicted before me, the subscriber, a justice of the peace of the county aforesaid, on the oath of John W. Dexter, with being a disorderly person, and having, on the 12th of November, used indecent and profane language, on Fourteenth street, in the city of Washington and county aforesaid; and having failed to give security for her good behavior; you are, therefore, hereby commanded to take the said Julia Reed into your custody, and deliver her, together with this warrant, to the intendant of the asylum; and you, the said intendant, are hereby required and authorized to receive the said Julia Reed, and her safe keep at hard labor for the space of sixty days from and after the date hereof, unless sooner discharged by due course of law. Given under my hand and seal this 13th day of November, 1835. Samuel Stittinius, Justice of the Peace." This warrant was issued under the by-law of the corporation of Washington of the 16th of December, 1812; by the sixth section of which it is enacted "that all vagrants, idle and disorderly persons, persons of ill fame, persons likely to become chargeable to the corporation as paupers, persons found begging or drunk in or about the streets or loitering in or about tippling houses; all suspicious persons, persons who have no fixed place of residence or cannot give a good account of themselves, persons guilty of profane or indecent language or behavior, shall, on information made before any justice of the peace, as aforesaid, by a credible citizen, be required to enter into security for good behavior, for a reasonable time, and indemnify the corporation against any charge for their support; and in case of refusal, or inability to give such security, they shall be confined to labor for a time, not exceeding ninety days, unless such security be sooner given; and the same proceedings shall be had against such person or persons so offending, for each and every offence." This by-law was passed under the supposed authority of the sixth section of the amended charter of the 4th of May, 1812, which, among other things, gives the corporation power and authority "to cause vagrants, idle or disorderly persons, all persons of evil life or ill fame," &c., and "all who are guilty of open profanity or grossly indecent language or behavior publicly in the streets," &c., "to give security for their good behavior for a reasonable time, and to indemnify the city against any charge for their support; and in case of their refusal, or inability to give such securi-

ty, to cause them to be confined to hard labor for a limited time, not exceeding one year at a time, unless such security should be sooner given."

Mr. Dermott and Mr. Dandridge, for prisoner, contended:

1. That the justice of the peace had no jurisdiction of the offences created by the by-laws of the corporation.

2. That he had no authority to send a white person to the asylum; and the commitment does not state that the prisoner was a colored woman.

3. That the corporation has no judicial powers unless given by the charter, and cannot erect judicial tribunals, nor designate certain justices of the peace to execute their by-laws, nor exercise any other powers not expressly given by the charter, or necessary for the execution of powers expressly given.

4. That the warrant of commitment was void, because not under seal.

Mr. Bradley, contra, contended that the fines, penalties, and forfeitures under the by-laws, were debts, and recoverable like any other debts, that is, before a justice of the peace, if not exceeding twenty dollars, (which was then the limit of his jurisdiction as to value,) and before the circuit court when the debt exceeded that value; and the magistrate acted ministerially in taking security for good behavior, &c.

CRANCH, Chief Judge. By the act of congress of the 27th of February, 1801, § 11 (2 Stat. 103), the justices of the peace for the respective counties in the District of Columbia, in matters civil and criminal, and whatever relates to the conservation of the peace, have all the powers vested in justices of the peace, as individual magistrates by the laws therein before continued in force, &c., and in personal demands to the amount of twenty dollars. By the charter of 1802 (2 Stat. 195), § 7, the corporation of Washington had power to pass by-laws and ordinances upon certain subjects, and to impose fines, penalties, and forfeitures for the breach of their ordinances; and to pass all ordinances necessary to give effect and operation to all the powers vested in the corporation. And all fines, penalties, and forfeitures under twenty dollars, were to be recovered before a single magistrate, as small debts were by law recoverable; and if over twenty dollars, by action of debt in the circuit court of the district for the county of Washington, in the name and for the use of the corporation. These provisons of the first charter were continued until 1820. By the first section of the charter of 1820, the act granting the charter of 1802, the supplement of 1804, and the amendment of 1812, and all other acts, or parts of acts, inconsistent with the charter of 1820, were repealed; provided that all acts and things done, or which then might be done by the corporation in pursuance of the provisions of the said acts, and

not inconsistent with the provisions of the act of 1820, were to remain valid, as if that act had never been passed. The charter of 1802 gave no power to inflict corporal punishment for the breach of any ordinance; nor did the supplementary act of 1804. The sixth section of the amendment of the charter in May, 1812, authorized the punishment of the offence of nightly and other disorderly meetings of free negroes and mulattoes, by fixed penalties, not exceeding twenty dollars for any one offence; and in case of inability to pay the penalty and costs, authorized confinement to labor, (not hard labor,) for such reasonable time, not exceeding six months for any one offence, as should be deemed equivalent to such penalty and costs. It also authorized the corporation "to cause all disorderly persons," "and all who are guilty of open profanity or grossly indecent language or behavior publicly in the streets" "to give security for their good behavior for a reasonable time, and to indemnify the city against any charge for their support; and, in case of their refusal or inability to give such security, to cause them to be confined to labor for a limited time, not exceeding one year at a time, unless such security should be sooner given." The same act authorized the punishment of slaves, for disorderly meetings, by whipping or imprisonment. The same act of 1812 first gave the corporation authority "to erect and establish workhouses, houses of correction and penitentiary buildings" for the use of the city. It does not expressly designate the manner in which the offence of "open profanity, or grossly indecent language or behavior publicly in the streets," shall be ascertained; nor who shall require the security, and commit to the confinement to labor. But, by the seventh section of the act, the marshal is to receive and safely keep within the gaol for Washington county, at the expense of the city, all persons committed thereto, under the sixth section of the act, until other arrangements should be made by the corporation for the confinement of offenders within the provisions of the said section; and it provides "that in all cases where suit shall be brought before a justice of the peace, for the recovery of any fine or penalty, arising from or incurred for the breach of any by-law or ordinance of the corporation, upon the return of nulla bona to any fi. fa. issued against the property of the defendant or defendants, it shall be the duty of the clerk of the circuit court for the county of Washington, when required, to issue a ca. sa. against every such defendant, returnable to the next circuit court for the county of Washington. thereafter, and which shall be proceeded on as in the other writs of the kind."

By the charter of 1820 (section 7) the corporation is authorized "to impose and appropriate fines, penalties, and forfeitures for the breach of their laws or ordinances, and to provide for the appointment of inspectors. constables, and such other officers as may be neces-

sary to execute the laws of the corporation." But the persons who are to execute those offices, are, by the 3d section, to be appointed by the mayor, with the consent of the board of aldermen. By the 8th section, the corporation has authority "to establish and erect watch and work houses, houses of correction, and penitentiary and other buildings," to punish nightly and other disorderly meetings of free negroes and mulattoes, by penalties not exceeding $20 for one offence; and, if unable to pay, to cause the offenders to be confined to labor, (not hard labor,) for any time not exceeding six calendar months; "to cause all who shall be guilty of open profanity, or grossly indecent language or behavior, publicly in the streets, to give security for their good behavior, and to indemnify the city against any charge for their support; and in case of their refusal or inability to give such security, to cause them to be confined to labor until such security shall be given; not exceeding, however, one year at a time;" "to punish, corporally, any colored servant or slave for a breach of any of their laws or ordinances, unless the owner or holder of such servant or slave shall pay the fine in such cases provided; and to pass all laws which shall be deemed necessary and proper for carrying into execution the powers vested by this act, (the charter of 1820,) in the said corporation or its officers." And by the 9th section, the marshal of the District of Columbia is "to receive and safely keep, within the gaol of the county of Washington, at the expense of the said corporation, all persons committed thereto under or by authority of the provisions of this act. And in all cases where suit shall be brought, before a justice of the peace, for the recovery of any fine or penalty arising or incurred for a breach of any law or ordinance of the corporation, execution shall and may be issued as in all other cases of small debts."

These are all the provisions of the acts of congress which affect the present case; and there does not appear to have been given to the corporation, by any of its charters, or the amendments thereof, any authority, directly, to punish a free person, corporally, for the violation of its by-laws. They can only impose fines, penalties, and forfeitures for the breach of their ordinances, to be recovered as debts. The only case in which labor may be added to imprisonment, for non-payment of the fine or penalty, is that of a free negro or mulatto who has been convicted of being present at a disorderly meeting, and who is unable to pay the fine; for, if he is able to pay, the fine may be collected by the ordinary process of execution. If unable to pay in money, it was intended, by the charter, that he should pay in labor; and he could not be forced to labor unless confined. Hence, it was provided that he should be confined to labor, instead of simple imprisonment upon a ca. sa. It was not so much intended as a punishment as a means of recovering the penalty. A free negro or mulatto, who is able to

pay his fine, cannot be confined to labor for any violation of a by-law of the corporation. So, in the case of a violation of a by-law, by a colored servant or slave, the magistrate, upon conviction, must give judgment for the fine or penalty; and if the owner or holder of such servant or slave shall pay the fine, there can be no corporal punishment.

In all cases of breach of the by-laws, the prosecution is by an action of debt, and the judgment can be only for the fine, penalty, or forfeiture. In ordinary cases, the execution, to enforce the payment, is a ca. sa., or fi. fa., or attachment; in the case of the inability of the free negro or mulatto to pay the fine for the offence of disorderly meeting, it may be by commitment to labor, for a limited time; and in the case of a colored servant or slave, it may be corporal punishment, if the owner or holder will not pay the fine. The difference is not in the judgment, but in the execution. In all cases the prosecution is for the recovery of the penalty. Such being the case, there is no difficulty in supporting the jurisdiction of the justices of the peace, in the recovery of these penalties.

By the charter of 1802 (section 7) all the fines, penalties, and forfeitures imposed by the corporation, if not exceeding $20, (which was then the extent of the jurisdiction of a justice of the peace, in small debts,) were expressly directed to be recovered before a single magistrate, as small debts were then, by law, recoverable; and if exceeding that amount, by action of debt, in this court, in the name and for the use of the corporation. This provision of the charter was in force when the act of the 15th of May, 1820 (3 Stat. 183), was passed, and was not repealed by the first section of that act, which purports to repeal only such previous acts and parts of acts as were inconsistent with the provisions of that act, namely, the act of 15th May, 1820. This provision, designating the mode of the recovery of fines, penalties, and forfeitures imposed by the corporation, and giving jurisdiction to the justices of the peace, and to this court, was not only not inconsistent with the provisions of the act of 1820, but seems to have been recognized by that act, as still existing. Thus, by the 3d section of that act, the mayor is, ex officio, to have and exercise all the powers, authority, and jurisdiction of a justice of the peace for the county of Washington, which would seem to be an almost nugatory grant of power, if a justice of the peace of the county of Washington had no cognizance of the breaches of the ordinances of the corporation. So, also, in the 9th section, the marshal is required to receive and safely keep, within the gaol of Washington county, at the expense of the corporation, all persons committed thereto under the authority of the provisions of that act; that is, persons who might be committed upon ca. sa., or for labor, or for want of security in cases where the charter authorized the corporation to re-

quire security. The same section also provides, "that in all cases where suit shall be brought before a justice of the peace for the recovery of any fine or penalty, arising or incurred for a breach of any law or ordinance of the corporation, execution shall and may be issued, as in other cases of small debts." This last clause is an express recognition of the powers of the justice of the peace, and strongly implies that congress believed that the powers given to the justice of the peace, by the first charter, still continued; for it is not expressly given by any of the provisions of the act of 1820. This inference is strongly corroborated by the other provisions just mentioned. Thus, why require the marshal to receive persons committed, if there was no authority to commit? Why give the corporation authority to require security from vagrants and others mentioned in the 8th section, if there was no magistrate to cite such persons before him, to give the security? But if jurisdiction of suits for the recovery of these fines and penalties has not been given to the justices of the peace, and to this court, by either of the charters, have they not jurisdiction by virtue of the powers and jurisdiction conferred by the act of the 27th of February, 1801? By the fifth section of that act, this court has jurisdiction "of all cases, in law and equity, between parties, both or either of which shall be resident or found within the district."

The question whether a fine, or penalty, or forfeiture has been incurred under a by-law of the corporation, is as much a case at law as a question whether a man has violated his contract; and, whether it be a civil or a criminal case, it is still cognizable by this court, if the amount of the fine or penalty is sufficient to sustain the jurisdiction. So also a fine or penalty incurred by a breach of an ordinance of the corporation, is a debt, and could always be recovered at common law as a debt; and if the amount be small it is a small debt and comes within the jurisdiction of a justice of the peace; and by the eleventh section of the act of the 27th of February, 1801, the justices of the peace have, in all matters civil and criminal, all the powers which justices of the peace then had; "and shall also have cognizance of personal demands to the value of twenty dollars, exclusive of costs." The fine, penalty, or forfeiture, incurred by breach of a by-law, is a personal demand; and where the amount is less than twenty dollars, the act of 27th February, 1801, expressly gives the cognizance to a justice of the peace. So that, either under the express provision of the charter of 1802, not repealed by that of 1820, or under the act of 27th February, 1801, the jurisdiction, both of the justice of the peace, and of this court, is very clear, so far as concerns the recovery of fines, penalties, and forfeitures, for breaches of the by-laws of the corporation, and the commitment for the nonpayment thereof, and the confinement to la-

bor in cases of inability to pay, where such commitment to labor is authorized by the charter. But the case now before the court. is not a case of commitment and confinement to labor for inability to pay a fine or penalty incurred for a breach of a by-law; it is for the failure to give security for good behavior, by a person whom the magistrate requiring the security has convicted, upon the oath of a witness, of being a disorderly person; and of having used indecent and profane language, on a public street in the city of Washington.

It is contended that the justice of the peace, who issued this warrant of commitment, had no jurisdiction of the case, and no power to commit for that cause. By the eighth section of the charter of 1820, the corporation has power and authority to cause "vagrants, idle or disorderly persons," "and all who shall be guilty of open profanity, or grossly indecent language or behavior publicly in the streets," to give security for their good behavior, for a reasonable time, and to indemnify the city against any charge for their support; and in case of their refusal or inability to give such security, to cause them to be confined to labor until such security shall be given, not exceeding, however, one year at a time. When the corporation has exercised the authority thus given them, by enacting by-laws and ordinances requiring security of such persons, those by-laws and ordinances are as much binding upon all persons within the corporate jurisdiction as if congress itself had enacted them for the government of the whole district. If they had been thus immediately enacted by congress there could have been no doubt that the justices of the peace would have had power to require the security, and, for that purpose, to cite such persons to appear before them, and upon their refusal or inability to give the security, to cause them to be confined to labor until such security should be given, not exceeding, however, one year at a time. By the English statute of 34 Eliz. 3, c. 1, justices of the peace. are authorized, "to take of all them be not of good fame, where they shall be found, sufficient surety and mainprise of their good behavior." Although nearly five centuries have elapsed since that statute was enacted. the phrase, "not of good fame," has never been precisely defined, and much has been left to the discretion of the magistrate. But by a course of decisions, for a period of more than four hundred years, it has been extended to persons suspected to be "dangerous, quarrelsome, or scandalous;" "those who sleep in the day and go abroad at night," "such as keep suspicious company," "such as are generally suspected to be robbers, &c;" "eavesdroppers; common drunkards," "and all others whose misbehavior may be reasonably intended to bring them within the meaning of the statute as being contrary to good manners; such as haunting bawdy-houses with women of bad fame; keeping

bad women in his house," &c. This statute, with these expositions of it, was in force in Maryland on the 27th February, 1801, and constitutes a part of the authority and jurisdiction of the justices of the peace of this county, who have been appointed under the act of congress of that date. The eighth section of the charter of 1820, so far as it regards security for good behavior, was evidently framed upon the statute of Edward 3d, and its judicial expositions; and, although somewhat enlarged, may be considered as substantially the same. If, then, congress, instead of authorizing the corporation of Washington to require security in the cases stated in that section of the charter, had, itself, required the security, the justices of the peace would have had jurisdiction to carry the act into effect. But the by-law, enacted under the authority of the charter, is as valid a law as if it had been enacted by congress, and the justices of the peace are equally authorized to enforce it. That such was the understanding of congress may be inferred from their not having designated any other officer or tribunal to require the security and to commit to labor for not complying with the requisition; and from their having required the marshal to receive and safe keep, in the county gaol, all persons committed thereto under the authority of that act; for the provision would have been nugatory if there had been no authority to commit, nor any person liable to be committed. We are, therefore, of opinion, that a justice of the peace of the county of Washington has authority under the charter, and the by-law of the 16th of December, 1812, to cause vagrants, &c., to be brought before him, and to require security for their good behavior, and to order them to be confined to labor, according to the provisions of the by-law, so far as they are authorized by the charters of 1802 and 1812, and not inconsistent with the new charter of 1820. The sixth section of the by-law of 16th December, 1812, was passed under the authority of the sixth section of the amended charter of May 4th, 1812, which authorizes the corporation "to cause all disorderly persons," and "all who are guilty of open profanity, or grossly indecent language or behavior publicly in the streets," to give security, &c. But the by-law authorizes the justice of the peace to require security of all disorderly persons, and persons guilty of profane or indecent language or behavior, although the prafanity be not "open," and the language or behavior neither "grossly" indecent, nor "publicly;" nor "in the streets." That part of the by-law which requires security to be given by persons guilty of simple profane or indecent language or behavior, is not warranted by the charter, and is void; but so far as it requires security to be given by "disorderly persons," it is warranted by the charter of 1812, and is not inconsistent with that of 1820.

The warrant of commitment, in the present case, states that Julia Reed stands convicted before the justice, on the oath of John W. Dexter, of being a disorderly person, and therefore states a good cause for requiring security according to the by-law; and it states that she failed to give security for her good behavior; but it does not state that she was required to give security; nor in what sum; nor for what period of time, so that it might appear that the sum and time were "reasonable," and that she might know what security to provide; for the confinement is not to be for any number of days or months absolutely, but, in the words of the charter of 1820, "until such security shall be given, not exceeding one year at a time." Nor does the warrant state that she refused, or was unable to give the security required.

The commitment also requires the intendant to keep her at hard labor. This implies a degree of labor more severe than that of ordinary, moderate, labor, and is not warranted by the by-law, or the charter. The labor was not intended as a punishment, but as the means of indemnifying the corporation for the expense of maintaining the person in confinement. For these errors and defects in the commitment, the court is of opinion that the prisoner must be discharged.

THRUSTON, Circuit Judge, did not entirely concur in all the views of the subject stated in the opinion of the court, particularly in regard to the exceptions taken to the form and terms of the warrant of commitment.